IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>CHANDRA NORTON | Criminal Action No.<br><br>1:20-CR-297-SDG |

**The Government's Sentencing Memorandum**

The United States of America, by and through undersigned counsel, files this Sentencing Memorandum to assist the Court in imposing a fair and reasonable sentence.

Defendant Chandra Norton ("Norton") pleaded guilty to conspiracy to commit wire fraud for submitting fraudulent loan applications under the Paycheck Protection Program ("PPP"), and then diverting the use of the unlawfully obtained funds for her personal use and benefit rather than for expenses authorized under the PPP. (Doc. 1).

For the reasons more fully set forth herein, the government respectfully recommends that the Court sentence Defendant to a term of imprisonment at the low end of the applicable advisory sentencing range produced by the United States Sentencing Guidelines (the "Guidelines") and a three-year term of supervised release. Such a sentence will provide punishment that is sufficient, but not greater

1

than necessary to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

## I. Background

On November 12, 2020, Norton pleaded guilty to a single count Information of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, for engaging in a conspiracy to defraud the PPP. (Doc. 1; Doc. 10-1). Norton specifically was charged for conspiring with Shelitha Robertson ("Robertson") to submit fraudulent PPP loan applications on behalf of entities Norton owned. (Doc. 1). The fraudulent applications Norton submitted falsely represented the average monthly payroll and number of employees associated with each applicant business, including false supporting tax documentation, and falsely certified that the information contained in the application was true and accurate. (Doc. 1 at ¶¶ 13-15; Trial Tr. in *United States v. Robertson*, No. 22-cr-432 (N.D. Ga) ("Trial Tr.") 288 21 – 289 11).

Norton admitted to submitting at least eleven fraudulent loan applications on behalf of entities she owned, which resulted in $7,785,062 in funding. (Presentence Investigation Report ("PSR") ¶¶ 13, 20; Trial Tr. 288 2-8). In addition, the conspiracy involved submitting fraudulent loan applications on behalf of four

entities owned by Robertson, seeking and obtaining a total of $7,020,779 in PPP loan funding.

Norton admitted that she used the funds she obtained on behalf of entities she owned for expenses not authorized under the PPP, including to purchase a 2020 Land Rover luxury SUV and to deposit funds into a personal brokerage account. (Trial Tr. 290 2-3).

## II. The Applicable Guidelines Range

### A. Pursuant to the Plea Agreement the Parties Agreed to a Loss Amount of Less Than $9,500,000

The government submits that for Guidelines purposes, the loss estimate reflected in Norton's plea agreement, which specifies a loss amount between $3,500,000 and $9,500,000, is appropriate. (*See* Doc. 10-1 at ¶ 13(b)). At co-defendant Robertson's sentencing, the Court ruled that the total loss amount associated with the conspiracy and attributable to both Norton and Robertson is $14,805,841. Nonetheless, the plea agreement was executed in November 2020 and the loss amount set forth therein represents the "benefit of the bargain" Norton made with the government. *See, e.g.*, *United States v. Camacho*, 233 F.3d 1308, 1323 (11th Cir. 2000) (noting that defendant "received the full benefit of the bargain she made with the Government" by entering into a plea agreement.).

### B. The Zero Point Offender Reduction Under § 4C1.1 Applies

The parties agree that Norton is eligible for a two-point reduction to her offense level as a zero-point offender, pursuant to USSG § 4C1.1. That provision, which went into effect after the final PSR was issued, authorizes a decrease of two levels from the offense level for defendants who "did not receive any criminal history points" and whose instant offense did not involve specified aggravating factors. USSG § 4C1.1.

The PSR calculated a total offense level of 24, based in part on a loss amount of between $3,500,000 and $9,500,000 as reflected in the parties' plea agreement. (*See* PSR ¶¶ 47-57). A two-level reduction pursuant to § 4C1.1 would result in an offense level of 22. Should the Court accept this determination with respect to the calculation of the total offense level, the applicable Guidelines range is 41 to 51 months before any downward departure. *See* Guidelines Ch. 5, Part A.

### III. Restitution

The parties agree that the amount of restitution owed is $4,425,002.23. This figure represents the actual loss attributable to Norton and Robertson's conspiracy. As detailed in the attached schedule (Exhibit ("Ex.") A) describing the PPP funds obtained by Norton and Robertson, the amount of restitution owed is based upon the total amount of the loans fraudulently obtained that caused the

4

financial institution victims—the PPP lenders—to fund, less credits for money recovered by the victims, plus applicable interest and processing fees. *See* Ex. A.

### IV.     Consideration of Sentencing Factors Under 18 U.S.C. § 3553(a)

The § 3553(a) factors relevant to Norton support the government's recommendation for the Court to impose a sentence at the low end of the applicable Guidelines range and a term of supervised release of three years.[1]

#### A. The Serious Nature and Circumstances of the Offense

In early 2020, the COVID-19 pandemic necessitated nationwide lockdowns that ground the economy to a halt, sending stock markets crashing and unemployment rates skyrocketing. Many American businesses—particularly small businesses—struggled to stay afloat as consumer demand plummeted and in-person services abruptly ceased. Employees relying on these paychecks to support their families faced unprecedented uncertainty. The Coronavirus Aid, Relief, and Economic Security (CARES) Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was up to $349 billion in forgivable

---

[1] Pursuant to the plea agreement, the government makes no recommendation as to the amount of the fine to be imposed. (Doc. 10-1 at ¶ 21).

loans through the PPP. In or around April 2020, an additional $300 billion was authorized. To obtain a PPP loan, an applicant had to certify that the loan would be used to pay for payroll, lease or mortgage interest, or utilities, and the loan was forgivable if the business spent a certain percentage of the loan on payroll costs, given that all of the information in the application and supporting documents was true.

Because Congress' intent was to "provide relief to America's small businesses expeditiously," the PPP streamlined the Small Business Administration's typical lending requirements. *Businesses Loan Program Temporary Changes; Paycheck Protection Program*, 85 Fed. Reg. 20811-01 (Apr. 15, 2020). For example, the PPP "allow[ed] lenders to rely on certifications of the borrower in order to determine eligibility of the borrower and use of loan proceeds and to rely on specified documents provided by the borrower to determine qualifying loan amount and eligibility for loan forgiveness." *Id*. These procedures were designed to rapidly provide desperately needed funds to small businesses so they could keep their workers employed during an economic and public health emergency that threatened the viability of these businesses, and their ability to pay employees. Thus, the program dispensed with some of the usual underwriting checks on the applicant and depended on the applicants' honesty.

Fraudulent PPP applications, in addition to being unlawful, caused two distinct harms as the lenders were attempting to quickly review and distribute funds: (1) each fraudulent application that was funded took funds away from the limited pool of money available for legitimate applicants, and (2) each fraudulent application drew away time and resources from the lenders and intermediaries who were working to distribute funds to proper borrowers as quickly as possible in light of the fast-moving economic crisis.

Norton selfishly and intentionally exploited this national emergency and the government's response to it by engaging in a conspiracy with Robertson to submit false PPP applications seeking over $14 million in PPP funds. Funds for the PPP were limited, and the legitimate demand for relief money exceeded the available supply. Thus, funds disbursed to Norton and her co-conspirator were diverted away from qualified applicants and kept lenders from working to distribute funds to proper borrowers.

The scope of Norton's criminal acts was significant in its breadth. These acts were not isolated instances or one-off errors in judgment. Rather, Norton took part in a conspiracy that lasted several months and resulted in the submission of numerous fraudulent loan applications on behalf of companies she and Robertson each owned. Norton took deliberate and calculated steps to fraudulently receive

and conceal the PPP funds and received a significant amount of money. After obtaining the loan proceeds, the funds were not used for purposes authorized under the PPP, but instead were used to purchase a 2020 Land Rover luxury SUV and to deposit funds into a personal brokerage account. (Trial Tr. 290 2-3).

### B. History and Characteristics of the Defendant

Norton is 56 years old and resides in Johns Creek, Georgia. She earned a juris doctorate and was a practicing attorney and member in good standing of the State Bar of Georgia beginning in 1993. (PSR ¶¶ 78-79; Trial Tr. 291 10-20). She also started CamKen Consulting, a water and sewer construction and rehabilitation company, which served municipalities throughout the southeastern United States for over 20 years. (*See* Trial Tr. 290 16 – 291 9). As a result of her offense conduct in this case, Norton was disbarred by the State of Georgia. (Trial Tr. 291 20-25).

Norton's education and professional experience—as an attorney and as a successful business owner—are factors weighing in favor of a sentence within the applicable Guidelines range. Norton's history and characteristics reflect how an educated professional and officer of this Court took advantage of a program that was designed to help struggling businesses during the pandemic. Norton knew better than to apply for fraudulent loans and had no reason to do so—other than

8

greed. Indeed, "[c]riminals who have the education and training that enables people to make a decent living without resorting to crime are *more* rather than less culpable than their desperately poor and deprived brethren in crime." *United States v. Howard*, 28 F.4th 180, 210 (11th Cir. 2022) (internal quotations omitted) (emphasis added).

Norton contacted the government in early June 2020, after learning that her fraud had been detected and that the government was investigating the PPP loans she had obtained. She then accepted responsibility for her conduct, waived indictment, and pleaded guilty. (*See* Doc. 2, Doc. 10).

The government understands that Norton has serious medical conditions.[2] Nonetheless, Norton's medical conditions do not warrant a downward departure or non-custodial sentence pursuant to USSG § 5H1.4. *See, e.g.*, *United States v. Smith*, 128 F. App'x 89, 90 (11th Cir. 2005) (unpublished) (weakened immune system causing vulnerability to future illnesses based on cancer in remission insufficient to satisfy Section 5H1.4); *Swiss v. United States*, No. CRIM. 1:08CV076, 2008 U.S. Dist. LEXIS 121250, at *9 (W.D.N.C. Mar. 20, 2008) ("For these reasons the Court cannot find or conclude that Petitioner would be eligible for a

---

[2] Because this Sentencing Memorandum is being publicly filed, the government is not providing additional details regarding Norton's medical condition.

downward departure under § 5H1.4 in light of the Petitioner's cancer diagnosis and the treatment available to him through the Bureau of Prisons.").

As to the Bureau of Prisons (BOP) facility where Norton serves her sentence, the BOP generally is equipped to house inmates with significant medical conditions—including conditions comparable to Norton's—and deals with such inmates routinely. The government has engaged with BOP regarding Norton's specific conditions, and BOP is indeed equipped to provide adequate care to Norton in a Federal Medical Center, even if it cannot guarantee continuation of the clinical trial protocols in which she participates.[3]  The government will supplement this memorandum with a declaration from BOP stating its ability to accommodate Norton's medical conditions.  Because BOP is equipped to care for Norton's medical conditions, a custodial sentence in a BOP facility, rather than home detention, is warranted.

### C. Need to Afford Adequate Deterrence to Criminal Conduct

A sentence within the advisory Guidelines range is necessary to afford adequate deterrence and to reflect the seriousness of the offense, promote respect

---

[3] The government is prepared to recommend to the Court that Norton be permitted to report to the designated BOP facility after the conclusion of her treatment in the clinical trial.

10

for the law, and provide just punishment for the offense. 18 U.S.C. § 3553(a)(2). The Eleventh Circuit has identified general deterrence as "an important goal of sentencing in a white-collar crime prosecution." *United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013); *see also United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) ("[T]he threat of spending time on probation simply does not, and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time."); *United States v. McQueen*, 727 F.3d 1144, 1158 (11th Cir. 2013) (recognizing that general deterrence is one of the "key purposes of sentencing.") (citation omitted).

As the Eleventh Circuit has recognized, deterrence is especially important in the context of crimes, like Norton's in this case, that "may easily go undetected and unpublished." *See McQueen*, 727 F.3d at 1158-59 (reversing the district court's lenient sentence because it "sap[ped] the goal of general deterrence"); *see also Howard*, 28 F.4th at 209 ("General deterrence is more apt, not less apt, in white collar crime cases."). One analysis found that approximately 12.3 percent of the PPP loans granted to small businesses, totaling $64.2 billion, have at least one indicator of potential fraud. *See* John M. Griffin et al., *Did Fintech Lenders Facilitate PPP Fraud?* (Mar. 15, 2022), available online at https://ssrn.com/abstract=3906395 (last visited August 8, 2024). Because of the

11

sheer number of PPP loans as well as the streamlined documentation necessary to obtain them, the government is unlikely to detect and/or to prosecute most individuals who obtained fraudulent PPP loans. These circumstances alone make general deterrence significant in this case.

Also, "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidate[s] for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding the district court's sentence utterly failed to afford adequate deterrence) (internal quotations omitted). "White collar criminals often calculate the financial gain and risk of loss of their crimes, and an overly lenient sentence sends the message that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *Howard*, 28 F.4th at 209 (quoting *Martin*, 455 F.3d at 1240) (internal quotations omitted); *see also Kuhlman*, 711 F.3d at 1329 (vacating a sentence of time served for defendant who stole millions of dollars from insurance companies.).

COVID-19 relief funds were meant to protect businesses from shutting down due to the economic harm the pandemic caused, not line the pockets of individuals who embellished financials, or created their own business, for the

12

purposes of greed and personal gain. Those who sought to defraud COVID-19 disaster relief programs took limited funds out of the hands of legitimate applications and made it more difficult to disperse aid to those who needed it. A significant downward variance from the Guidelines would be substantively unreasonable for the type of economic crime committed by Norton. *See, e.g.*, *Kuhlman*, 711 F.3d at 1329.

Sentencing Norton to a custodial sentence at the low end of the advisory Guidelines range will help to deter others from fraudulently applying for government-backed loans during a national emergency and then laundering the proceeds of those funds. It will provide an important message that there are serious consequences for exploiting a national emergency and stealing disaster-relief money earmarked for small businesses. A custodial sentence will also specifically deter Norton from committing another crime.

**D. Need for the Sentence to Avoid Unwarranted Sentencing Disparities**

A sentence at the low end of the applicable Guidelines will not create an unwarranted sentencing disparity. "One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008); *see also United States*

*v. Snipes*, 611 F.3d 855, 870 (11th Cir. 2010) (explaining that Guidelines were created after "empirical analysis of sentences for white-collar crimes" determined that white-collar crimes "were given considerably lower sentences.").

Courts in this Circuit and elsewhere have imposed significant sentences of imprisonment for pandemic-related fraud. *See*, *e.g.*, *United States v. VanderMolen*, No. 23-1552, 2024 WL 1434206 (6th Cir. Apr. 3, 2024) (affirming a 30-month sentence for defendant responsible for a loss of approximately $170,000 in fraudulent PPP loans); *United States v. Griffin*, No. 22-4673 (4th Cir. Apr. 8, 2024) (affirming a 66-month term of imprisonment for defendant responsible for loss over $2,000,000 in fraudulent PPP and EIDL loans); *United States v. Crosby*, No. 21-cr-00011-LMM (N.D. Ga June 7, 2024) (37-month sentence for defendant involved in $900,000 conspiracy to submit fraudulent PPP applications); *United States v. Almaguer*, No. 22-CR-80118 (S.D. Fla. May 19, 2023) (87-month sentence for defendant responsible for $8.4 million in fraudulent PPP loans); *United States v. Tubbs*, 20-cr-00193 (E.D. Ark. March 15, 2021) (41-month term of imprisonment for defendant responsible for loss of $1.9 million resulting from two fraudulent PPP loans).

Though "for purposes of § 3553(a)(6), a defendant who cooperates with the Government and pleads guilty is not 'similarly situated' to [her] co-defendant who

proceeds to trial," *United States v. Cavallo*, 790 F.3d 1202, 1237 (11th Cir. 2015), it is important to note that a custodial sentence at the low end of the Guidelines range for Norton would avoid unwarranted sentencing disparities with Norton's co-conspirator, who received a custodial sentence of 87 months.  *See Robertson*, No. 22-cr-432 (Doc. 127).

Accordingly, the imposition of a significant term of imprisonment within the advisory Guidelines range would be appropriate and not create any unwarranted sentencing disparity.

## Conclusion

For the reasons stated above, the government respectfully requests that the Court impose a custodial sentence at the low end of the applicable Guidelines range and a term of supervised release of three years.

> Respectfully submitted,
>
> RYAN K. BUCHANAN
> *United States Attorney*
>
> /s/BERNITA MALLOY
> *Assistant United States Attorney*
> Georgia Bar No. 718905
>  75 Ted Turner Drive SW
> Atlanta, GA 30303
> Bernita.Malloy@usdoj.gov
>
> GLENN S. LEON
> *Chief, Fraud Section*

*U.S. Department of Justice*

/s/ ARIEL GLASNER
*Trial Attorney, Fraud Section*
*U.S. Department of Justice*
D.C. Bar No. 991442
1400 New York Ave, NW
Washington, DC 20005
Ariel.Glasner@usdoj.gov

## Certificate of Service

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system.

August 12, 2024

/s/ ARIEL GLASNER
Trial Attorney, U.S. Department of Justice